WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Merrill Lynch Bank USA, | ) | No. CV 09-734-PHX-JAT |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Barry Wolf; Andrew Goldstein, | ) | |
| Defendants. | ) | |
| Barry Wolf; Andrew Goldstein, | ) | |
| Counterclaimants, | ) | |
| vs. | ) | |
| Merrill Lynch Bank, USA, | ) | |
| Counterdefendant. | ) | |

Pending before the Court is Plaintiff/Counterdefendant Merrill Lynch Bank USA's ("Merrill Lynch") Motion for Partial Summary Judgment as to several of Defendants/Counterplaintiffs Barry Wolf and Andrew Goldstein's counterclaims and the portion of Defendants' damage claims attributable to "additional interest." Merrill Lynch filed the Motion pursuant to Federal Rule of Civil Procedure 56. The Court now rules on the Motion.

**I. BACKGROUND**

Defendants opened accounts at Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPFS") in 2007. They soon also opened Merrill Lynch Loan Management Accounts ("LMAs"). LMAs allow customers to obtain loans secured by the value of securities held with Merrill Lynch. In opening their accounts, Defendants signed a Merrill Lynch Loan Management Application that incorporates by reference a Merrill Lynch Loan Management

Account Agreement ("LMA Agreement").

Mr. Goldstein began using his LMAs in April 2007, and Mr. Wolf began using his in November 2007. Defendants originally opened floating-rate loans, then later converted them to fixed-rate loans. In the fall of 2008, motivated by historically low interest rates, Defendants considered converting their fixed-rate loans back to floating-rate loans.

In November 2008, Defendants inquired about the process for converting their five fixed-rate loans to variable-rate loans and any breakage fees they would incur in doing so. On November 5, 2008, Merrill Lynch provided breakage fee quotes totaling more than $500,000, which was substantially higher than Defendants expected. Merrill Lynch provided Defendants three additional breakage fee estimates ranging from $150,000 to more than $700,000. During a conference call on November 10, 2008, Merrill Lynch informed Defendants that it would assess breakage fees based on the Eurodollar Forward Swap Contract rate (the "EFSC rate"), rather than the London Interbank Offered Rate ("LIBOR"). Defendants claim that, from the beginning, Merrill Lynch told them that their loan rates would always be tied to LIBOR and that any potential breakage fees would be calculated using LIBOR. Merrill Lynch employees confirmed that the breakage fee calculation would be based on the EFSC rate in another conference call with Defendants on November 21, 2008. Defendants requested written notification of the calculation method, which Merrill Lynch provided on January 13, 2009.

During this same period, adverse conditions in the financial markets impacted the value of Defendants' pledged collateral. Mr. Goldstein's collateral fell below the bank's minimum margin requirements, triggering a series of "collateral calls." To meet these calls, Mr. Goldstein needed to post additional collateral or sell some of his investments to pay down his loans, which would have incurred a breakage fee. Instead, Mr. Goldstein arranged to transfer to Mr. Wolf all of his rights and obligations under his two LMA loans and the assets he had pledged as collateral.

To accomplish the transfer, Merrill Lynch required Defendants to enter into an

"Assignment and Assumption Agreement" ("Assignment Agreement"). The Assignment Agreement provided that Mr. Goldstein assigned to Mr. Wolf, and Mr. Wolf accepted and assumed from Mr. Goldstein, all of Mr. Goldstein's rights and obligations relating to the loans. The Assignment Agreement also contained a release by which Mr. Goldstein released any claims he had against Merrill Lynch and an acknowledgment by Mr. Wolf that he disavowed any claim against Merrill Lynch in connection with Mr. Goldstein's loans. Both Defendants signed the Assignment Agreement, which was dated November 10, 2008, and transmitted signed copies to Merrill Lynch on November 13, 2008. Merrill Lynch then removed Mr. Goldstein's loans from his account and posted them to Mr. Wolf's account. As a result, Mr. Wolf's account contained five fixed-rate loans.

Although Mr. Wolf professed a desire to convert the fixed-rate loans to variable-rate loans, he did not immediately do so. Mr. Wolf prepaid three of the loans in March 2009 and a fourth loan in June 2009, incurring breakage fees on all four. The fifth loan is still intact.

Merrill Lynch filed its Complaint for Declaratory Relief on April 9, 2009 (Doc. 1), seeking a determination as to the parties' rights and obligations under the LMA Agreement, specifically the amount of breakage fees Merrill Lynch can assess against Defendants/Counterplaintiffs. On September 3, 2009, Defendants filed an Answer and Counterclaims (Doc. 25.) On April 23, 2010, Defendants filed their Second Amended Answer and Counterclaims (Doc. 26.) Merrill Lynch moved for partial summary judgment as to (1) Mr. Goldstein's counterclaims in their entirety, (2) Mr. Wolf's counterclaims based on the loans Mr. Goldstein originated, and (3) the portion of Defendants' damage claims attributable to "additional interest."

**II. LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the

1   existence of an element essential to that party's case, and on which that party will bear the

2   burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3       Initially, the movant bears the burden of pointing out to the Court the basis for the

4   motion and the elements of the causes of action upon which the non-movant will be unable

5   to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-

6   movant to establish the existence of material fact. *Id.* The non-movant "must do more than

7   simply show that there is some metaphysical doubt as to the material facts" by "com[ing]

8   forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

9   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P.

10  56(e)).

11      A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could

12  return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

13  248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a

14  material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. However,

15  in the summary judgment context, the Court construes all disputed facts in the light most

16  favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir.

17  2004).

18      **III. CHOICE OF LAW**

19      Merrill Lynch cites primarily to New York and Utah law because the Assignment

20  Agreement and LMA Agreements include New York and Utah choice-of-law provisions.

21  Defendants assert that these provisions are not valid or effective under Arizona choice-of-law

22  rules.

23      A federal court sitting in diversity must look to the forum state's choice of law rules

24  to determine the controlling substantive law. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d

25  1180, 1187 (9th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487

26  (1941)). In Arizona, choice of law provisions in contracts are generally enforced, *see Landi*

27  *v. Arkules*, 835 P.2d 458, 462 (Ariz. App. 1992), but the validity of a particular provision

28

1    must be assessed under Restatement (Second) of Conflict of Laws § 187, *see Cardon v.*

2    *Cotton Lane Holdings, Inc.*, 841 P.2d 198, 203 (Ariz. 1992).

3         The Restatement provides that the parties' choice of law applies if the parties could

4    have resolved explicitly a particular issue in their contract.  Restatement (Second) of Conflict

5    of Laws § 187(1).  Whether the parties could have determined a particular issue by explicit

6    agreement directed to that issue is a question to be determined by the local law of the state

7    selected by application of the rule of Restatement § 188.  Restatement § 187(1) cmt. c.

8    However, if the question would be decided the same way by the relevant local law rules of

9    all potentially interested states, there is no need for the forum to determine the state of the

10   applicable law using § 188. *Id.*

11        The LMA Agreement included the following choice-of-law provision:

12              This agreement shall be governed by and interpreted under federal law
                and the internal laws of the State of Utah (without regard to any choice
13              of law rule that would result in the selection of any law other than
                federal law or the internal laws of the State of Utah), except that with
14              respect to the Securities Account and Bank's line and security interest,
                this Agreement shall be governed by and interpreted under the internal
15              laws of the State of New York (without regard to any choice of law rule
                that would result in the selection of any law other than internal laws of
16              the State of New York).  (Doc. 62-2 at 116.)

17        The Assignment Agreement included the following choice-of-law provision:

18              <u>Governing Law</u>.  This Assumption Agreement shall be governed by,
                and construed and interpreted in accordance with, the laws of the State
19              of New York.  (Doc. 62-3 at 4.)

20        The relevant questions under Restatement § 187(1) are whether the parties could have

21   contractually resolved (1) the meaning and scope of the assignment and release provisions

22   and (2) the obligation of the parties to mitigate damages.  If these questions would be

23   resolved the same way under New York, Utah, or Arizona law, the Court need not determine

24   the state of the applicable law using Restatement § 188.

25        Contractual releases resulting in the relinquishment of a right or claim are enforceable

26   under New York, Utah, and Arizona law if unambiguous.  *Krumme v. Westpoint Stevens,*

27   *Inc.*, 238 F.3d 133, 144 (2d Cir. 2000); *Peterson v. Coca-Cola U.S.*, 48 P.3d 941, 945 (Utah

28

1   2002); *Cumis Ins. Soc'y, Inc. v. Merrick Bank Corp.*, 680 F. Supp. 2d 1077, 1091 (D. Ariz.

2   2010).  Similarly, under New York, Utah, and Arizona law, assignment of a claim transfers

3   all rights and interests in the claim to the assignee, leaving the assignor with nothing.  *James*

4   *McKinney & Son v. Lake Placid 1980 Olympic Games*, 462 N.E.2d 137, 139 (N.Y. 1984);

5   *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 710 F. Supp. 305, 309 (D. Utah

6   1989); *Van Waters & Rogers, Inc. v. Interchange Res.*, 484 P.2d 26, 29 (Ariz. Ct. App.

7   1971).  As to the obligation of the parties to mitigate damages, both Utah and Arizona[1] law

8   provide that a party may not recover damages which could have been avoided if he had made

9   reasonable efforts to lessen his losses.  *Madsen v. Murrey & Sons, Co.*, 743 P.2d 1212, 1214

10   (Utah 1987); *Coury Bros. Ranches v. Ellsworth*, 446 P.2d 458, 461 (Ariz. 1968).

11        Because questions pertaining to the release and assignment of claims would be

12   decided the same way under New York, Utah, or Arizona law and questions pertaining to a

13   party's duty to mitigate would be decided the same way under Utah or Arizona law, this

14   Court need not use § 188 to determine the state of the applicable law for purposes of the §

15   187(1) analysis.  *See* Restatement § 187(1) cmt. c.

16        Turning to the § 187(1) analysis, the Court notes that this section places few

17   restrictions on the parties' right to contract, *Swanson v. Image Bank, Inc.*, 77 P.3d 439, 443

18   (Ariz. 2003), and the parties generally have power to determine the terms of their contractual

19   engagements, Restatement § 187(1) cmt. c.  Because the parties could have resolved (1) the

20   meaning and scope of the assignment of rights and release of claims and (2) the obligations

21   of the parties to mitigate damages by explicit provisions in their agreements, the Court finds

22   that the choice-of-law provisions are valid.  Accordingly, the Court will apply New York law

23   to  issues relating to the assignment and release of claims pertaining to Mr. Goldstein's loans

24   and Utah law to the additional interest damages claim.

25

26       [1] Merrill Lynch asserts that Utah law controls as to the parties' obligations to mitigate

27   damages because the parties' LMA Agreement, from which Defendants' damages claims
     arise, includes a Utah choice-of-law provision.

28                                                 - 6 -

1

**IV. ANALYSIS AND CONCLUSION**

2    Merrill Lynch has moved for summary judgment on Mr. Goldstein's claims, arguing

3 that they fail because he (1) released his claims and (2) assigned his rights to Mr. Wolf, and

4 therefore lacks standing.  Merrill Lynch has moved for partial summary judgment as to Mr.

5 Wolf's counterclaims arising from the origination of Mr. Goldstein's loans, asserting that

6 those claims are barred by Mr. Goldstein's release, and as to both Defendants' claims for

7 additional interest damages.  The Court will address each in turn.

8    **A. Goldstein's Claims**

9    Merrill Lynch asserts that in signing the Assignment Agreement, Mr. Goldstein

10 assigned to Mr. Wolf all of Mr. Goldstein's rights and obligations relating to the loans and

11 released any claims against Merrill Lynch in connection with them, including any claims

12 relating to breakage fees.  As a result of the release, Merrill Lynch maintains that Mr.

13 Goldstein's claims against it must fail.  Merrill Lynch further asserts that because Mr.

14 Goldstein assigned all his rights related to the loans to Mr. Wolf, he lacks standing.

15    Defendants raise a number of reasons that the release is unenforceable according to

16 its terms.  Defendants assert that they signed the Assignment Agreement merely for their own

17 business purposes and did not intend to relinquish Mr. Goldstein's interests in the assets and

18 liabilities transferred to Mr. Wolf.  In addition, Defendants assert that there was no

19 consideration for the Assignment Agreement because the agreement had no effect on Merrill

20 Lynch.  Finally, Defendants argue that the release is invalid because it was allegedly buried

21 in the Assignment Agreement, and Merrill Lynch never pointed it out or explained it to them;

22 they were not represented by counsel at the time they signed the release; the parties had

23 unequal bargaining power; and their claims against Merrill Lynch had not arisen at the time

24 of signing.

25    The Assignment Agreement provided, "Assignor hereby explicitly releases Lender,

26 its officers, directors, employees, agents, and affiliates from any claim or defense, known or

27 unknown, matured or unmatured, relating to the Loan Documents or otherwise" (Doc. 62-3

28

at 4.)  Defendants  transmitted a signed copy of the Assignment Agreement to Merrill Lynch on November 13, 2008.

A valid contractual release results in the relinquishment of a right or claim, *see Eddy v. Champlain Milk Producers Coop., Inc.*, 630 N.Y.S.2d 427, 428 (App. Div. 1995), and bars any action on a claim which is the subject of the release, *Nat'l Union Fire Ins. Co. v. Walton Ins., Ltd.*, 696 F. Supp. 897, 901 (S.D.N.Y. 1988).  If a contractual release is unambiguous, a court must enforce it according to its terms.  *Krumme*, 238 F.3d at 144.

Defendants argue that the release language is ambiguous in that it allegedly indemnifies Merrill Lynch only for claims related to the Assignment Agreement, but then refers to a release for claims relating to loan documents generally.  However, the Court is unable to discover where in the release language the indemnification was supposedly limited to the Assignment Agreement.  The Assignment Agreement expressly releases Merrill Lynch from liability for "any claim . . . relating to the Loan Documents or otherwise" (Doc. 67-3 at 4.)   Accordingly, the Court finds that the language of the release is unambiguous.

Defendants assert that the release is unenforceable because in signing the Assignment Agreement they did not intend to release Mr. Goldstein's interests in the assets and liabilities transferred.   But where "the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation."  *New Bank of New England, N.A. v. Toronto-Dominion Bank*, 768 F. Supp. 1017, 1022 (S.D.N.Y. 1991).  Thus, Defendants' subjective motivations in signing the Assignment Agreement are not relevant.[2]

---

[2]  Even if the Court were to apply Arizona law to this question, the parole evidence rule would not permit introduction of evidence that directly contradicts the agreement. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1141 (Ariz. 1993) (holding that in Arizona, "the parole evidence rule does not apply to exclude evidence unless the evidence varies or contradicts the agreement").

1    Defendants also assert that the Assignment Agreement lacked consideration and is

2    therefore unenforceable because it had no effect on Merrill Lynch.  However, Merrill Lynch

3    counters that Defendants' LMA Agreements included a provision expressly prohibiting

4    assignment of the rights and obligations under those agreements.  When Mr. Goldstein

5    decided to assign his loan obligations to Mr. Wolf, he had to ask Merrill Lynch's permission

6    to do so, and the Assignment Agreement was the requisite inducement for Merrill Lynch to

7    consent to the assignment.   Pursuant to the Assignment Agreement, Merrill Lynch

8    surrendered its right to enforce the LMA's non-assignment terms against Mr. Goldstein.

9    Because under New York law forbearance from the assertion of a legal right constitutes valid

10   consideration, *see, e.g.*, *Rogowsky v. McGarry*, 865 N.Y.S.2d 670, 671 (App. Div. 2008),

11   Defendants' claim is without merit.

12   Defendants next assert that the release should not be enforced because the Assignment

13   Agreement constituted a contract of adhesion.  Defendants argue that the release was buried

14   in the Assignment Agreement, they were not represented by counsel when they signed it, and

15   the parties had unequal bargaining power.  "Adhesion is found where the party seeking to

16   enforce the contract used high pressure tactics or deceptive language in the contract and

17   where there is inequality of bargaining power between the parties.  In addition, it must be

18   shown that the contract inflicts substantive unfairness on the weaker party." *In re Ball*, 665

19   N.Y.S.2d 444, 446 (App. Div. 1997) (enforcing contractual release where party had sufficient

20   time to read release and opportunity to seek clarification of its terms).

21   Here, the Assignment Agreement was a two-page document in standard print, and the

22   release was contained in a section entitled "Indemnities and Release" (Doc. 62-3 at 4.)

23   Under New York law, "a party cannot generally avoid the effect of a release on the ground

24   that he or she did not read it or know its contents." *Martino v. Kaschak*, 617 N.Y.S.2d 529,

25   530 (App. Div. 1994) (enforcing release agreement even though party claimed he did not

26   read it and did not realize it was a release).  Defendants were not represented by counsel in

27   signing the release, but they are sophisticated businessmen with more than thirty years of

28

business experience.  And in signing the Assignment Agreement, Defendants agreed that "they have each obtained, or had an adequate opportunity to obtain, separate and independent legal and tax counsel" (Doc. 62-3 at 4.)  Because there is no indication that Merrill Lynch used deceptive language or high pressure tactics to get Defendants to sign the release and Defendants have not alleged that the Assignment Agreement inflicts substantive unfairness on them, the Court concludes that the Assignment Agreement is not a contract of adhesion.

Finally, Defendants argue that the release is unenforceable because their claims had not yet arisen at the time they signed the Assignment Agreement.  However, in signing the Assignment Agreement, Defendants agreed to release Merrill Lynch from "any claim or defense, known or unknown" (Doc. 62-3 at 4.)  Even assuming that Defendants are correct in asserting that their damages claims were unknown at the time they signed the Assignment Agreement,[3] the release still bars claims based upon Mr. Goldstein's loans.  *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983) (holding where a release covers unknown or future claims, a court is required to enforce its provisions as to both known and unknown claims).

Because the Court finds that the Assignment Agreement is valid and enforceable and the release language is unambiguous, the Court will enforce it according to its terms.  The Court concludes that in signing the Assignment Agreement, Mr. Goldstein assigned all his rights and obligations related to the loans to Mr. Wolf and released any claims against Merrill Lynch in connection with the loans.

Merrill Lynch asserts that because Mr. Goldstein assigned his rights and obligations to Mr. Wolf, he lacks standing to bring damages claims against it.  To have standing to assert a claim, a litigant must have some legally cognizable right or interest.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Where a party has filed suit to vindicate contractual

---

[3]  Defendants' own characterization of the facts suggests it was apparent that the parties disagreed as to the breakage fee calculations by November 10, 2008.

1   rights, but the evidence shows he has already assigned those rights to others, his claim fails

2   for lack of standing.  *See McKinney*, 61 N.Y.2d at 838; *Maxus Leasing Group, Inc. v.*

3   *Kobelco Am., Inc.*, 2007 WL 655779 at *2 (N.D.N.Y. Feb. 26, 2007).  Because Mr. Goldstein

4   assigned his contractual rights to Mr. Wolf, he lacks standing to assert claims against Merrill

5   Lynch.  The Court will therefore grant summary judgment in favor of Merrill Lynch as to

6   Mr. Goldstein's counterclaims in their entirety.

7                    **B. Wolf's Counterclaims Arising from Goldstein's Loans**

8          Merrill Lynch further asserts that in signing the Assignment Agreement, Mr. Wolf

9   expressly disavowed any claim against it in connection with Mr. Goldstein's loans.[4]  As a

10  result, Merrill Lynch seeks summary judgement as to the claims Mr. Wolf asserts arising

11  from Mr. Goldstein's loans.  In their response, Defendants refer to their earlier arguments

12  that the language was not negotiated, not disclosed, and lacked consideration.  In addition,

13  Defendants assert that their breakage fee claims did not arise until after the assignment and

14  are therefore not barred by Mr. Wolf's acknowledgment in the Assignment Agreement that

15  he disavowed any claims against Merrill Lynch in connection with Mr. Goldstein's loans.

16

17         The Court has already concluded that the Assignment Agreement was not a contract

18  of adhesion and did not lack consideration.  Since Defendants have not pointed to any

19  ambiguity in the acknowledgment language, the Court concludes that the provision is

20  enforceable according to its terms.  Accordingly, Mr. Wolf cannot raise any claims against

21  Merrill Lynch in connection with Mr. Goldstein's loans, regardless of whether they arose

22  after he signed the Assignment Agreement.  The Court will therefore grant summary

23

24  _____

25         [4]  The Assignment Agreement, which Defendants transmitted to Merrill Lynch on
    November 13, 2008, provided, "Assignee [Wolf] hereby . . . acknowledges and admits that
26  he has no defenses, offsets, or claims, either in his own right or as successor-in-interest to
    Assignor [Goldstein], against Lender whatsoever in respect thereof [to Goldstein's loans]"
27  (Doc. 62-3 at 4.)

28                                              - 11 -

1    judgment in favor of Merrill Lynch as to Mr. Wolf's counterclaims arising from Mr.
2    Goldstein's loans.

3        **C. Defendants' Claim for "Additional Interest" Damages**

4        In connection with their counterclaims, Defendants seek two types of damages: (1)
5    the excess breakage fees assessed by Merrill Lynch, and (2) "the additional interest costs
6    incurred because of the difference between the fixed interest rate they are incurring and the
7    lower interest rate they could have been incurring with a variable interest rate LMA
8    account"[5] (Doc. 67 at 43.)  Merrill Lynch seeks summary judgment as to the second damages
9    claim, arguing that Defendants' failure to mitigate bars any claim for additional interest
10   damages.

11       Merrill Lynch asserts that the parties were aware as early as November 7, 2008 that
12   they disagreed as to the breakage fee calculations, while Defendants claim that they first
13   realized on January 13, 2009 that Merrill Lynch was breaching their agreements as to the
14   method of calculation.   However, Defendants also admit that they were informed on
15   November 10, 2008, during a conference call with Merrill Lynch employees, that Merrill
16   Lynch would calculate breakage fees using the EFSC rate (Doc. 73 at 14.)  And Merrill
17   Lynch employees confirmed the calculation method during another conference call with
18   Defendants on November 21, 2008 (*Id.*).  Merrill Lynch confirmed the calculation method
19   in writing on January 13, 2009 (Doc. 67-4 at 56-57.)

20       Defendants assert that they made repeated attempts to mitigate their damages through
21   written requests on January 28, February 16, March 3, and March 19, 2009 to convert their
22   fixed-rate loans to variable-rate loans through prepayment and to resolve the breakage fees
23   later through negotiation or litigation (Doc. 73-4 at 21-29.)  Merrill Lynch counters that these

24   _____

25       [5] Defendants first requested breakage fee quotes on November 5, 2008 (Doc. 62-3 at
26   11), but did not convert their loans at that time.  Mr. Wolf prepaid three loans in March 2009
     and a fourth in June 2009, incurring breakage fees on all four loans (Doc. 62-4 at 62.)  The
27   fifth loan remains intact (*Id.*)

28                                           - 12 -

1    written communications were not attempts to mitigate damages, but instead demands for

2    Merrill Lynch to issue a more favorable breakage fee based on Defendants' calculations.

3    Merrill Lynch asserts that if Defendants succeed in their breach of contract claim, they

4    should be entitled only to the excess breakage fees, if any, it assessed against them, and not

5    to any additional interest damages.

6         Under Utah law, damages awarded for breach of contract are limited to those damages

7    that place the non-breaching party in as good a position as if the contract had been

8    performed.  *Mahmood v. Ross*, 990 P.2d 933, 940 (Utah 1999).  But under the doctrine of

9    avoidable consequences, the non-breaching party "has an active duty to mitigate his

10   damages, and he may not, either by action or inaction, aggravate the injury occasioned by the

11   breach."  *Id.*  The general "rule is that where one party definitely indicates that he cannot or

12   will not perform a condition of a contract, the other is not required to uselessly abide time,

13   but may act upon the breached condition.  Indeed in appropriate circumstances he ought to

14   do so to mitigate damages."  *Univ. Club v. Invesco Holding Corp.*, 504 P.2d 29, 30 (Utah

15   1972).  What constitutes a reasonable time to act in mitigating damages varies with the

16   particular facts and circumstances of each case, but where the relevant facts are

17   uncontroverted, that question is one of law.  *Broadwater v. Old Republic Sur.*, 854 P.2d 527,

18   531 (Utah 1993).

19        Defendants' duty to mitigate their damages began at the point they believed that

20   Merrill Lynch was breaching their agreement as to the method for calculating breakage fees.

21   Construing the facts in the light most favorable to Defendants as the non-moving party, the

22   Court concludes Defendants had a duty to mitigate their damages at least as early as

23   November 21, 2008, when Merrill Lynch confirmed that they would calculate breakage fees

24   using the EFSC rate.  Defendants assert that Merrill Lynch failed to mitigate by ignoring

25   their repeated requests in early 2009 to negotiate the breakage fees.  However, Merrill Lynch

26   had already confirmed, verbally and in writing, its earlier statement that it would not

27   calculate the breakage fees using LIBOR.  Merrill Lynch did not have a duty to mitigate

28

- 13 -

through reconsideration of its announced decision to calculate breakage fees using the EFSC rate (which Defendants contend was a breach of their agreement).  Rather, the duty to mitigate fell on Defendants, who could have lessened their interest costs through breaking their loans.     Defendants did not break the first three of their loans until nearly three months after they received confirmation that Merrill Lynch would not calculate breakage fees using LIBOR.  They broke the fourth loan nearly six months later, and the fifth loan still remains intact.  During the period between first learning of Merrill Lynch's refusal to calculate breakage fees as anticipated and breaking the first three loans in March 2009, Defendants incurred between $6,000 and $10,000 per week in additional interest costs (*see* Doc. 73-4 at 26.)  The Court concludes that given Defendants' delay in breaking their loans and the resulting accrual of additional interest costs, Defendants failed to actively mitigate their damages.  Therefore, Defendants are not entitled to additional interest damages.

Merrill Lynch has also moved for the Court to take judicial notice of "Entity Information" regarding MLPFS (Doc. 77.)  Since the Court has concluded that the parties' New York choice-of-law provision is enforceable under Restatement § 187(1), there is no need for the Court to take judicial notice of MLPFS's status as a New York corporation.

Accordingly,

IT IS ORDERED granting Merrill Lynch's Motion for Partial Summary Judgment (Doc. 70) as to (1) Mr. Goldstein's counterclaims in their entirety; (2) Mr. Wolf's counterclaims arising out of the two fixed-rate loans Mr. Goldstein originated; and (3) Mr. Wolf's counterclaim for additional interest damages.

IT IS FURTHER ORDERED denying as moot Merrill Lynch's Request for Judicial Notice in Support of Motion for Partial Summary Judgment .

DATED this 1st day of December, 2010.

James A. Teilborg
United States District Judge

- 14 -